Pettinato v EQR-Rivertower, LLC (2023 NY Slip Op 00068)

Pettinato v EQR-Rivertower, LLC

2023 NY Slip Op 00068

Decided on January 10, 2023

Appellate Division, First Department

RENWICK, J.P., 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: January 10, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick
David Friedman Anil C. Singh Martin Shulman John R. Higgitt

Index No. 159909/16 Appeal No. 16441 Case No. 2021-03134 

[*1]Laura Pettinato et al., Plaintiffs-Respondents,
v
EQR-Rivertower, LLC, et al., Defendants-Appellants, Old Castle Building Envelope, Inc., Defendant.

Defendants appeal from an order of Supreme Court, New York County (Francis A. Kahn, III, J.), entered July 20, 2021, which denied in part defendant River Tower Owner, LLC's motion to compel plaintiff Laura Pettinato to appear for a full and complete independent medical examination.

Tyson & Mendes LLP, New York (Bryan J. Ferrara of counsel), for EQR-Rivertower, LLC, EQR-Rivertower A, LLC, EQR-Rivertower B, LLC, EQR-Rivertower C, LLC, EQR-Rivertower D, LLC and EQR-Rivertower E, LLC, appellants.
Rosenbaum & Taylor, P.C., White Plains (Leslie Luke and Tracy L. Frankel of counsel), for River Tower Owner, LLC, appellant.
McMahon, Martine & Gallagher, LLP, Brooklyn (Patrick W. Brophy of counsel), for respondents.

RENWICK, J.P., 

In this personal injury action, plaintiff's complaint alleges that she slipped while exiting the shower/bathtub and fell on the shower track, in the bathroom of her apartment, in the building owned and operated by defendants. Plaintiff claims that she suffered serious and permanent injuries to her genital area, including her pelvic area, and that such injuries resulted in current symptoms that include her inability to engage in prolonged sitting without pain, and her lack of flexibility on the right side of her body. To contest the extent of plaintiff's injuries, as well as whether her current conditions are proximately caused by her genital injuries, defendants seek to conduct an independent medical examination (IME) of plaintiff comprised of a comprehensive gynecological examination inclusive of a pelvic examination. Supreme Court permitted the gynecological examination, but not the pelvic examination. For the reasons that follow, we find that Supreme Court should not have limited the scope of the IME.
Factual and Procedural Background
Plaintiff's slip and fall occurred in March 2016. Plaintiff commenced this action in November 2016. From the inception of the litigation until the present, plaintiff has been treated by Dr. Linda A. Kiley, MD., who is both a general obstetrician and a gynecologist, with a subspecialty in female pelvic medicine and reconstructive surgery. As indicated in plaintiff's bill of particulars, Dr. Kiley's initial examination of plaintiff revealed that plaintiff suffered serious injuries, including a vulvar laceration, tenderness and swelling of the labia, pelvic pain, pudendal neuralgia,[FN1] and dyspareunia.[FN2]
Subsequent to plaintiff's examination before trial, defendants designated Dr. Lawrence Lind (a medical doctor specializing in urogynecology) to examine plaintiff regarding her genital injuries. Plaintiff appeared for the IME with Dr. Lind on March 14, 2019, but declined to remove her clothes. Defendants then moved to compel plaintiff to appear for a comprehensive gynecological examination that included the use of a speculum, a digital examination, and a bimanual examination of the pelvis.
In support of the motion, defendants submitted an affidavit (dated 2/18/2021), from Dr. Lind indicating [*2]that "[i]n order to assess the severity of each of [plaintiff's] medical problems a full gynecological examination is required." Dr. Lind explained that "[a] proper inspection of the vulva simply cannot be conducted merely by . . . a visual inspection" because such inspection "would only potentially allow him to see any scar and would not allow [him] to be able to evaluate the vagina or the pudential nerve." Thus "[a] one finger examination is needed in order to fully inspect the entire vulva." Further, Dr. Lind explained, "[w]hereas Plaintiff is not just claiming to have sustained a vulvar laceration, but [she] is also claiming severe pelvic pain, severe tenderness of the labia, vulvodynia, pudendal neuralgia and dyspareunia, a routine comprehensive gynecological examination is needed in order to properly evaluate her physical complaints and the possible causes thereof, including to assess the presence of any cysts which could contribute to Plaintiff's claimed pain." Finally, Dr. Lind indicated, "[t]his examination would be less than five minutes in length and would require the use of a speculum, digital exam and bimanual exam of the pelvis."
In opposition, plaintiff submitted two affidavits from her treating physician, Dr. Linda A. Kiley, MD. In her first affidavit dated 1/24/2020, Dr. Kiley indicated that forcing plaintiff to submit to a "further examination without clothes would not be relevant to or revealing of her present symptoms and conditions referable to her accident. Her chief symptoms and conditions presently are nerve damage for which she has been prescribed and is taking gabapentin; surface pain after prolonged sitting; lack of flexibility on the right side; and PTSD [posttraumatic stress disorder]." Dr. Kiley also expressed concerns that because plaintiff allegedly suffers from PTSD as a result of the accident, "subjecting her to further and unnecessary pelvic examination would pose a clear and significant risk of harm to [plaintiff] in potentially triggering her PTSD."
In her second affidavit (dated 4/3/2021), Dr. Kiley indicated her specific concerns about the proposed pelvic examination, which were as follows:
"While Dr. Lind proposes classic pelvic exam techniques, those would not be revealing of her current complaints. Her current complaints mainly revolve around neuropathic pain which Gabapentin is controlling very well; surface pain after prolonged sitting; lack of flexibility on the right side; and PTSD. Neuropathy and neuropathic pain typically cannot be found on a pelvic or one finger exam. The surface pain after prolonged sitting and the lack of flexibility also would not be evaluated [by] the exam techniques proposed by Dr. Lind. Of course[,] PTSD is not evaluated by those techniques either, though in this instance those techniques could provoke it with this patient."
As indicated, the motion court granted the motion to compel the IME but limited the scope of the examination, so that the comprehensive gynecological [*3]examination would not include the techniques "involving use of a speculum, a digital exam and a bimanual exam of the pelvis . . . ." In balancing the need for the IME and the treating doctor's concerns for the health of her patient, the motion court rejected, as "unpersuasive," Dr. Kiley's concerns that the comprehensive gynecological examination would "trigger [plaintiff's] PTSD." Specifically, the motion court found that such opinion lacked any probative value where it was offered without any medical evidence from plaintiff's "treating psychiatrist, or any mental health professional." Nevertheless, the motion court found that plaintiff established that the pelvic exam procedures were "invasive and potentially harmful." Accordingly, the motion court suggested that "[o]ther . . . diagnostic or investigative procedures — such as X-ray, magnetic resonance imaging or similar techniques—should be considered."
Discussion
A plaintiff in a personal injury action affirmatively places her physical and/or mental condition in controversy (see Koump v Smith, 25 NY2d 287, 295 [1969]). Pursuant to CPLR 3121, following the commencement of an action, "[w]here a plaintiff puts her physical condition at issue, the defendants may require a plaintiff to submit to an IME by a physician retained by defendant for that purpose" (Markel v Pure Power Boot Camp, Inc., 171 AD3d 28, 29 [1st Dept 2019]; see also Arons v Jutkowitz, 9 NY3d 393, 409 [2007]). Thus, this is not a case about whether an IME, specifically a gynecological examination, should have been permitted.
Instead, this is a case about the scope of such a physical examination. In determining what kind of examination to authorize, the court must balance the desire for the plaintiff to be examined safely and free from pain against the need for the defendant to determine facts in the interest of truth (see Lefkowitz v Nassau County Med. Ctr., 94 AD2d 18, 21-22 [2d Dept 1983]). Thus, a showing of the medical importance and safety of the particular procedure is required, as well as an explanation of the relevance and the need for the information that a procedure will yield (id. at 21-22).
Accordingly, "an examination should not be required if it presents the possibility of danger to [a plaintiff's] life or health" (Lefkowitz, 94 AD2d at 21). For example, in D'Adamo v Saint Dominic's Home, the Second Department held that a protective order was warranted where the defendant sought to compel the plaintiff to undergo a rigid sigmoidoscopy [FN3], which requires penetration of the rectum (87 AD3d 966, 969-970 [2d Dept 2011]). The Second Department held that, "[e]ven though a defendant is entitled to thoroughly examine a plaintiff who puts his or her physical and/or mental condition in issue, a plaintiff may not be compelled to undergo objective testing procedures when it is established that the tests are invasive, painful, and harmful to the person's health" (id. at 970 [citations omitted]). The plaintiff met her initial [*4]burden of showing that the proposed procedures were "potentially harmful and clearly invasive," while "the defendant failed to establish that the intended procedures would not be harmful" (id.).
Conversely, a defendant is entitled to an IME of a plaintiff where the plaintiff fails to make a prima facie showing that it is potentially harmful or poses a serious threat to her health (see Chavoustie v New York Hosp.-Cornell Med. Ctr., 253 AD2d 702 [1st Dept 1998], lv denied 93 NY2d 805 [1999]; Koenig v Furniture Intrigue, 155 AD2d 243 [1st Dept 1989]; see also Lefkowitz, 94 AD2d at 21-22). For instance, in Humphrey v Cartagena (55 AD3d 333, 333 [1st Dept 2008]), this Court affirmed an order compelling a plaintiff to undergo a urodynamic study [FN4]. In Humphrey, the plaintiff had undergone a urodynamic study by her own physician but refused to undergo "a repeat urodynamic study" by defendant's designee. We found that the urodynamic study should proceed because the plaintiff failed to meet her burden to demonstrate that the studies would be harmful to her health, having submitted only her doctor's "conclusory assertion" that the studies "would cause discomfort" or infection (id.).
In the circumstances of this case, Supreme Court should not have limited the scope of the IME. Defendants' motion to compel was supported by a medical expert's affidavit showing that the comprehensive gynecological examination, which would include a pelvic examination, is necessary and material, that such examination was a routine procedure, and that it has no harmful effects. On this showing, the motion court should have allowed the comprehensive gynecological examination with the pelvic exam, particularly where plaintiff's medical expert does not materially controvert the opinion by defendant's expert. Absent any support for plaintiff's conclusory claim that a "further" pelvic examination would be harmful, the benefit of such examination to pretrial disclosure more than outweighs the discomfort to plaintiff.
Contrary to the dissent's allegations, the record does not support the motion court's determination that the pelvic examination techniques were "potentially harmful" to plaintiff. Indeed, plaintiff's treating physician herself classified the proposed examination as "classic pelvic examination techniques." Moreover, the only potential harm or threat to plaintiff's health indicated by plaintiff's treating physician was that the examination could potentially trigger PTSD. However, as the motion court properly found, the treating physician's assertion lacked any probative value as it was not accompanied by any supporting medical evidence from a treating psychiatrist or any other mental health professional. A conjectural assertion that a medical exam might trigger an unsubstantiated PTSD condition is not sufficient to warrant limiting the scope of an otherwise appropriate IME.
It is undisputed that a pelvic exam is a safe procedure. Indeed, plaintiff's treating physician [*5]performed the procedure on plaintiff. Unable to refute the safety of the procedure, the dissent purely speculates, arguing that the pelvic exam was not mandated because "there are less intrusive means to reach the same result." The dissent completely overlooks that plaintiff never argued that she should not be compelled to submit to a pelvic exam because, as the dissent argues, "there are less intrusive means to reach the same result." Nor did plaintiff's treating physician ever indicate that her client should not have a pelvic exam because there are less intrusive means available to defendant's doctor that would reach the same results as a pelvic exam. Thus, contrary to the dissent's speculation, nothing in the record indicates that there are less intrusive means available to defendant's doctor that would reach the same results as a pelvic exam.[FN5]
Instead, as an alternative reasoning for recommending that plaintiff should not be compelled to submit to a "further" pelvic examination, plaintiff's treating physician indicated that such examination was not medically indicated because plaintiff's "current complaints mainly revolve around" neuropathy and neuropathic pain which "typically cannot be found on a pelvic or one finger exam." This contention, which the dissent seemingly adopts, operates under the false assumption that a court must consider the medical benefits to be derived to plaintiff from the specific examination. Although such consideration may be necessary to a medical professional, the IME's purpose is consistent with the Civil Procedure Law and Rules. By definition, a CPLR 3121 examination is not performed for the patient's benefit. Rather, a CPLR 3121 examination is a litigation discovery device intended "[t]o narrow, if possible, the areas of medical dispute" (Jakubowski v Lengen, 86 AD2d 398, 400-401 [4th Dept 1982]; see also Thomas v Mather Mem. Hosp., 162 AD2d 521 [2d Dept 1990] ["Notwithstanding the plaintiff's assertions to the contrary, there is a need as well as a benefit to be derived from the CAT scan, since it may enhance the defendants' ability to prepare a defense"]). Here, there is a legitimate discovery basis for the pelvic exam: to establish the extent of plaintiff's injuries and whether plaintiff's current conditions can be attributed to such injuries.
Contrary to the dissent's contentions, we are indeed mindful that the manner in which a pelvic exam is performed may be embarrassing and even humiliating. Indeed, to alleviate plaintiff's apprehensions we mandate that the procedure be conducted by a female doctor to be chosen by defendants.[FN6] However, what we cannot overlook is that plaintiff, who is seeking substantial damages from defendants, has already gone through a comprehensive gynecological examination by her treating physician, without any medically reported adverse effects. The prior comprehensive gynecological exam clearly included a pelvic examination, as indicated by the treating physician's own finding [*6]of pelvic- related injuries. Indeed, the treating physician categorized the proposed pelvic examination as a routine practice (i.e., "classic pelvic exam techniques"), and there is no indication by the treating physician that she relied on any other alternative diagnostic techniques like those suggested by the motion court.
While this Court has sympathy for plaintiff's position, we find that plaintiff cannot raise her concerns as a bar to similar tests by the party she charges with responsibility for her current condition and injuries. Defendants do not have to rely upon previous pelvic examinations conducted by plaintiff's treating physician (see Humphrey, 55 AD3d at 333 [finding that the plaintiff's "doctor's conclusory assertion that a repeat procedure was 'contraindicated' because it would cause discomfort and could cause infection or exacerbate her condition was insufficient to constitute" a prima facie showing that the repeat procedure would pose a serious threat to her health]; Thomas v Mather Mem. Hosp., 162 AD2d 521 [finding that, even though examination procedure required the plaintiff to be sedated, the fact that the plaintiff had previously submitted to the same test or procedure voluntarily for his own physician, particularly on more than one occasion, countered allegations by the plaintiff that the test or procedure was dangerous]). Absent any support for the claim that the pelvic examination would be harmful, defendants are entitled to conduct their own pelvic examination for the purpose of refutation or confirmation of plaintiff's alleged serious and permanent injuries, and their correlation to plaintiff's current symptoms.
Finally, applying basic principles of CPLR discovery to require a plaintiff, who puts her gynecological condition at issue, to submit to an IME in the form of a gynecological examination that includes a routine pelvic examination, is not formalistic as the dissent alleges, but consistent with our role as judges to be fair and balanced even in the most difficult cases. A plaintiff who has voluntarily submitted to a routine pelvic examination by her own treating physician without adverse effects should be required to undergo a similar examination that is material and necessary to defend against her claims that she sustained serious gynecological injuries.
Accordingly, the order of Supreme Court, New York County (Francis A. Kahn, III, J.), entered July 20, 2021, which denied in part defendant River Tower Owner, LLC's motion to compel plaintiff Laura Pettinato to appear for a full and complete independent medical examination, should be modified, on the law and as a matter of discretion, to the extent of granting, pursuant to CPLR 3121, that portion of defendant's motion to compel plaintiff to submit to an IME comprised of a comprehensive gynecological examination of plaintiff including a pelvic examination, and otherwise affirmed, without costs. The IME must be conducted by a female doctor chosen by defendants[*7].
All concur except Singh, J. who dissents in part
in a Separate Opinion.
SINGH, J., dissenting in part
I dissent from the majority's decision to compel a woman who has brought a personal injury action alleging injuries to her pelvic area to undergo an intrusive pelvic examination by defendants' chosen physician. This error is compounded by the majority's disregard for Supreme Court's provident exercise of discretion. Supreme Court denied defendants' request for an invasive pelvic exam more than six years after the alleged incident and suggested that defendants should consider less invasive procedures. Defendants have not shown that the pelvic exam will provide material and necessary discovery to defend this personal injury action. The majority's insistence to reverse Supreme Court and order the pelvic exam fails to consider that there are less intrusive means to reach the same result. Nor does the majority cite to any case in which such an invasive pelvic exam was permitted in New York.[FN7]
The complaint alleges that on March 16, 2016, plaintiff Laura Pettinato (plaintiff) slipped while exiting the shower/bathtub in her apartment and fell onto the shower track, causing serious injuries, including a vulvar laceration, tenderness and swelling of the labia, pelvic pain, pudendal neuralgia, and dyspareunia, as well as psychological harm, including anxiety, depression, and PTSD. Defendants River Tower and the EQR LLCs (together, defendants) owned and operated the premises, including plaintiff's apartment. Plaintiff and her husband sued defendants for negligence in the ownership, management, and maintenance of their apartment and shower. During discovery proceedings, defendants designated Dr. Lawrence Lind, a urogynecologist, to conduct an independent medical examination (IME) of plaintiff's injuries. On May 14, 2019, plaintiff appeared for an IME with Dr. Lind but declined to remove her clothing. Dr. Lind states in his report that the "exam was limited by patient and counsel only to palpation exterior to her clothing." Two years later, on February 18, 2021, defendants moved to compel plaintiff to appear for a "full" examination. Plaintiff opposed. In her affidavit opposing the pelvic examination, Dr. Linda Kiley — plaintiff's treating physician who has treated plaintiff since November 2016 — describes the requested examination as "humiliating" and "invasive." Dr. Kiley also states that plaintiff suffers from "post-traumatic stress disorder (PTSD) as a result of the accident" and the examination sought by defendants poses the risk of significant psychological harm.
The court granted defendants' motion in part. Plaintiff was compelled to submit to "a full and complete independent medical examination" but defendants' request for an exam "involving use of a speculum, a digital exam and a bimanual exam of the pelvis" was denied. Defendants appeal.
Our discovery rules provide for "full disclosure of all matter material and necessary in the . . . defense [*8]of an action" by a party to that action (CPLR 3101[a]), including a physical examination of the plaintiff (see CPLR 3121; Koump v Smith, 25 NY2d 287, 295 [1969] ["if the mental or physical condition of a party is in controversy, the other party . . . may have him submit to a mental or physical examination"]). This is a rule of reason, however. The party seeking the examination has the burden to demonstrate the necessity for it (see Chaudhary v Gold, 83 AD3d 477, 478 [1st Dept 2011]). The availability of such an examination should not divest a person of complete bodily autonomy. It is well settled that "[u]nder our discovery statutes and case law, competing interests must always be balanced; the need for discovery must be weighed against any special burden to be borne by the opposing party" (O'Neill v Oakgrove Constr., 71 NY2d 521, 529 [1988]; see Kavanagh v Ogden Allied Maintenance Corp., 92 NY2d 952, 954 [1988] ["Once the lower courts have undertaken this balancing of interests with respect to discovery requests, this Court's review is limited to determining whether there has been an abuse of discretion"]; see also Andon v 302-304 Mott St. Assoc.,94 NY2d 740, 746 [2000]).
Our case law leaves no doubt that "a trial court has broad discretion over the discovery process, and its determinations will not be set aside absent a clear showing of abuse of discretion" (Rodney v City of New York, 192 AD3d 606, 606 [1st Dept 2021]; see Matter of U.S. Pioneer Elecs. Corp. [Nikko Elec.Corp. of Am.], 47 NY2d 914, 916 [1979] ["The determination as to the terms and provisions of discovery . . . rests in the sound discretion of the court to which application is made, subject to review by the intermediate appellate court, here the Appellate Division"]; Gumbs v Flushing Town Ctr. III, L.P., 114 AD3d 573, 574 [1st Dept 2014]["Notwithstanding our own discretion, 'deference is afforded to the trial court's discretionary determinations regarding disclosure'"], quoting Don Buchwald & Assoc. v Marber-Rich, 305 AD2d 338, 338 [1st Dept 2003]; Mendez v Equities By Marcy,24 AD3d 138, 138 [1st Dept 2005] ["the motion court properly exercised its broad discretion to supervise the discovery process"]; Stambovsky v Reiner, 145 AD2d 309, 310 [1st Dept 1988] ["The trial court has broad discretion in supervising discovery in order to prevent harassment and abuse"]). Whether to order plaintiff to submit to an IME falls within this discretion (see e.g. Orsos v Hudson Tr. Corp., 95 AD3d 526, 527 [1st Dept 2012] [affirming order for second IME and denial of discovery of prior IME because "the court did not improvidently exercise its discretion"]; Kashmer v City of New York, 23 AD3d 293, 293 [1st Dept 2005] ["The court also properly exercised its discretion in precluding defendant from conducting an independent medical examination of plaintiff"]).
In balancing the competing interests, Supreme Court should take into consideration the invasiveness of the procedure (see Peculic v Sawicki[*9], 129 AD3d 930, 931 [2d Dept 2015] ["a plaintiff . . . will not be required to undergo an examination or objective testing procedure which is invasive"]; Ditroia v Buck-Haskin, 99 AD3d 854, 854-855 [2d Dept 2012] [restoring case to trial calendar, despite plaintiff's refusal to undergo urodynamic testing that "is painful, invasive, and would be potentially harmful to the injured plaintiff's health"]; D'Adamo v Saint Dominic's Home, 87 AD3d 966, 970 [2d Dept 2011] [reversing denial of protective order prohibiting defendant's expert from performing invasive procedures, including a rigid sigmoidoscopy]; Santero v Kotwal, 4 AD3d 464, 465 [2d Dept 2004] [denying motion to compel submission to urological examination that "is potentially harmful, and clearly invasive"]; Bobka v Mann, 308 AD2d 497, 498 [2d Dept 2003] [affirming denial of motion to compel submission to urodynamic study that is potentially harmful, and "clearly invasive"]; see also Il Grande v DiBenedetto, 366 NJ Super 597, 616 [App Div 2004] ["The risk and pain an invasive procedure potentially presents to the objecting party are foremost concerns, given plaintiff's right to health, safety and well-being"]).
We have vested Supreme Court with the authority to engage in the discretionary balancing of competing interests. Although we are empowered to substitute our own discretion for that of the trial court, this is "a power we rarely and reluctantly invoke" (Estate of Yaron Ungar v Palestinian Auth., 44 AD3d 176, 179 [1st Dept 2007]; see Spira v Antoine, 191 AD2d 219, 219 [1st Dept 1993]["it generally is within the discretion of the motion court to determine the appropriate penalty to be imposed against an offending party. It would not be appropriate, at bar, for this Court to substitute its discretion for that of the justice sitting in the IAS court"]; see also e.g. Granitto v Kings Harbor Health Servs. LLC, 209 AD3d 431, 431 [1st Dept 2022] ["While the period of time covered by plaintiff's document demands is broad, we find no basis for substituting our discretion for that of the motion court"]; Transatlantic Reins. Co. v AIU Ins. Co., 126 AD3d 615 [1st Dept 2015] ["We see no need to substitute our own discretion in this case"]; Quaglia v 69th Tenants Corp., 198 AD2d 108, 108 [1st Dept 1993] ["This Court should not substitute its own discretion for that of the IAS court in supervising disclosure"]).
This is not that rare case. The majority simply substitutes its judgment over that of Supreme Court to impose its preferred outcome, without explaining how Supreme Court's finding was an abuse of discretion. Significantly, the court credited plaintiff's evidence that using a speculum, a digital exam and a bimanual exam of the pelvis "are invasive and potentially harmful." The court found that the procedure requested by defendants was unnecessary and recommended that "[o]ther applicable non-invasive diagnostic or investigative procedures — such as X-ray, magnetic resonance imaging or similar [*10]techniques — should be considered." Supreme Court reached its conclusion by balancing defendants' need for discovery and the special burden the invasive pelvic exam would place on plaintiff.
Defendants have not met their burden to compel plaintiff to submit to an intrusive pelvic exam. Defendants state that "[t]he routine comprehensive gynecological examination Dr. Lind seeks to perform is not an invasive test or procedure in light of the injuries that Plaintiff [Pettinato] is claiming to have sustained in the Accident." Dr. Kiley disputes both assertions, stating that "Dr. Lind was able to conduct a sufficient examination, and [plaintiff] should not be forced to undergo a further and more humiliating, or worse yet, invasive examination." Notably, Dr. Lind's affidavit is conclusory as to what he expects to find from this invasive exam. He states that the exam "cannot be conducted merely by having Plaintiff open her legs" but does not give any medical reasons as to defendants' adamant insistence on performing this intrusive examination. He insists that "[a] visual inspection would only potentially allow me to see any scar and would not allow me to be able to evaluate the vagina or the pudendal nerve." He reasons that this invasive exam is necessary to, among other things, "assess the presence of any cysts." However, there is no showing that the presence of cysts, for example, cannot be found by noninvasive diagnostic procedures.
Apart from claiming that it is a "classic pelvic examination technique," the majority does not explain how this examination technique, six years after the accident, will lead to material and necessary discovery that is not available by other, less invasive means.[FN8] Defendants have the medical records of plaintiff from Dr. Kiley's examination of plaintiff in 2016, yet do not state what they hope to achieve from an intrusive pelvic exam in 2022. There appears to be no dispute that plaintiff is in pain as even in the clothed examination, Dr. Lind's IME report, three years after the accident, confirms Dr. Kiley's assessment, stating that "there is discomfort along the line of the laceration during palpitation."
Instead of holding defendants to their burden, the majority applies our discovery rules formalistically, without due consideration of the full record. The majority does not explain why no weight should be given to the treating physician's opinion when balancing the competing interests. It notes that Dr. Kiley performed "a comprehensive gynecological examination" of plaintiff, including a pelvic examination. Thus, it summarily concludes that it would be appropriate for plaintiff to undergo a pelvic exam today because there were no "medically reported adverse effects" when the exam was performed six years ago.
Finally, the majority dismisses plaintiff's mental health as a factor to consider in determining the need for an invasive pelvic exam. Defendants similarly dismiss Dr. Kiley as not qualified to opine on her long[*11]-term patient's mental health. In denying defendants' motion for a gynecological examination, Supreme Court relied upon the invasiveness of the requested procedure, which alone justifies the court's decision. Nevertheless, in my view, Dr. Kiley's and plaintiff's own statements regarding plaintiff's anxiety and PTSD should be factored into determining whether an invasive examination is necessary (see Ditroia, 99 AD3d at 854 ["the plaintiffs established that the urodynamic testing sought by the defendant is painful, invasive, and would be potentially harmful to the injured plaintiff's health"]; D'Adamo, 87 AD3d at 969 [considering consequences of disputed procedure on specific patient at issue]). Weight should be given to the opinion of Dr. Kiley, plaintiff's treating physician. Critically, other than being dismissive of plaintiff's mental health, defendants do not proffer expert testimony disputing Dr. Kiley's opinion that the exam could cause mental trauma to plaintiff. Accordingly, I would affirm Supreme Court's decision and order, which denied in part defendant River Tower Owner, LLC's motion to compel plaintiff to appear for a full and complete independent medical examination.
Order, Supreme Court, New York County (Francis A. Kahn, III, J.), entered July 20, 2021, modified, on the law and as a matter of discretion, to the extent of granting, pursuant to CPLR 3121, that portion of defendant's motion to compel plaintiff to submit to an IME comprised of a comprehensive gynecological examination of plaintiff including a pelvic examination, and otherwise affirmed, without costs. The IME must be conducted by a female doctor chosen by defendants.
Opinion by Renwick, J.P. All concur except Singh, J. who dissents in part in an Opinion.
Renwick, J.P., Friedman, Singh, Shulman, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: January 10, 2023

Footnotes

Footnote 1: Pudendal neuralgia is long-term pelvic pain that originates from damage or irritation of the pudendal nerve — a main nerve in the pelvis (see https://www.nhs.uk/conditions/pudendal-neuralgia/#:~:text=Pudendal%20neuralgia%20is%20long%2Dterm,the%20buttocks%20and%20genitals%20(perineum [Last accessed December 16, 2022]). 

Footnote 2: Dyspareunia is the term for recurring pain in the genital area or within the pelvis during sexual intercourse (see https://www.healthline.com/health/dyspareunia [Last accessed December 16, 2022]).

Footnote 3: "A sigmoidoscopy is a diagnostic test used to check the sigmoid colon, which is the lower part of your colon or large intestine" (https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/sigmoidoscopy [Last accessed December 16, 2022]).

Footnote 4: Urodynamic studies test how well the bladder, sphincters, and urethra hold and release urine. These tests can show how well the bladder works and why there could be leaks or blockages (see https://www.urologyhealth.org/urology-a-z/u/urodynamics [Last accessed December 16, 2022]). "In a simple cystometrogram . . . the physician inserts a pressure catheter
into the bladder and using a manometer, records the pressure and flow in the lower
urinary tract" (https://www.buckeyehealthplan.com/content/dam/centene/policies/clinical-policies/Urodynamic%20Testing%20CP.MP.98.pdf [Last accessed December 16, 2022]).

Footnote 5: In fact, it was the motion court in its decision that first suggested that "[o]ther applicable non-invasive diagnostic or investigative procedures . . . should be considered." There was no evidence presented by the plaintiff regarding another procedure.

Footnote 6: Additionally, "[i]t is well established that a plaintiff is entitled to have a representative of her choice present during the IME, provided the individual does not interfere with the IME or prevent the defendant's doctor from conducting 'a meaningful examination.'" (Markel, 171 AD3d at 29). Indeed, that representative could be the plaintiff's treating physician.

Footnote 7: The majority twice cites to Humphrey v Cartagena (55 AD3d 333 [1st Dept 2008]), in which we affirmed Supreme Court's order compelling a plaintiff to submit to urodynamic testing. In Humphrey, we did not decide whether the testing was or was not invasive but limited ourselves to the issue before us, namely whether the testing was harmful. We assuredly did not find that a trial court would have erred in exercising its discretion differently.

Footnote 8: The majority's mandate that a female urogynecologist perform the exam misses the point. The gender of the examining doctor is not at issue but the intrusive procedure itself. Neither would the presence of plaintiff's representative at that procedure mitigate its intrusive nature.